## No. 14,232.

CITY AND COUNTY OF DENVER ET AL. *v.* HIGHLANDER BOY FOUNDATION.

(79 P. [2d] 361)

Decided April 11, 1938. Rehearing denied May 31, 1938.

Mr. MALCOLM LINDSEY, Mr. THOMAS H. GIBSON, for plaintiffs in error.

Mr. GOLDING FAIRFIELD, Mr. JAMES A. WOODS, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE BURKE delivered the opinion of the court.

THESE parties are hereinafter designated as the City and the Foundation respectively.

The Foundation brought this action against the City to quiet title to certain real estate in Denver against the purported lien of a special improvement tax. The City demurred on the ground of insufficient facts and defect of parties. Those demurrers were overruled and the City elected to stand. To review the judgment thereupon entered against it this writ is prosecuted. The alleged defect of parties is based upon the assumption that the tax imports bondholders whose securities must be paid from it and that such bondholders were necessary parties. We think the assumption unsupported, but if otherwise, as will hereafter appear, they stand to lose nothing.

■ The principal question presented is whether the City has lost its lien for the tax involved, approximately $1,100, by reason of the fact that its treasurer, in compliance with a statutory request for a certificate of "taxes due" furnished one which omitted said tax. Section 217, chapter 142, '35 C. S. A. (§7392 C. L. 1921) provides that the treasurer shall, on request and payment of his fee, furnish such a certificate. The following section provides that the certificate, with receipt showing payment of said taxes, "shall be conclusive evidence for all purposes and against all persons," that the tract "was at the time thereof free and clear of all taxes." The following section provides that loss resulting from any error in such cer-

tificate and receipt shall be paid by the county (formerly by the treasurer and his surety). In March, 1928, the Foundation, being then about to purchase the tract in question, procured this certificate; hence this suit.

The main contention raised was settled by this court in *Burton v. Denver,* 99 Colo. 207, 61 P. (2d) 856. We find no occasion to re-examine that authority.

■ Two new propositions are, however, here presented: 1. The whole matter is local and municipal over which Denver, a home rule city organized under article XX of the state Constitution, is given exclusive control. 2. The statutes above cited conflict with section 34 of the city's charter of March 29, 1904, and hence the latter is controlling.

If, as we conclude, the alleged conflict does not exist, we need go no further, since section 6 of said article provides for the applicability of all general statutes not superseded by charter ordinance. Said section 34 of the charter reads: "The Assessor shall provide in the assessment roll of general taxes a column wherein the Treasurer may make memoranda of special assessments. The Treasurer shall make suitable memoranda in such column, showing any unpaid special assessments levied before the receipt of the assessment roll, upon the property referred to in such memoranda. On request for the amount of taxes against any property the Treasurer shall include in his statement special assessments. No error, failure, neglect or default on the part of the Assessor or Treasurer in complying with the provisions of this section shall invalidate any tax or assessment or affect the lien thereof."

No question of the treasurer's memoranda in his official record is here before us. The "statement" above mentioned involves no formality and is based upon no special consideration. It may be a mere pencil notation, not only uncertified, but unsigned. It may even be oral. This is something entirely different from the formal certificate provided by statute, whose issuance is mandatory

and for which a fixed fee is exacted. Hence there is no conflict between statute and charter.

Other questions raised now, either become immaterial to a determination of the cause or are settled in the Burton case, supra.

The judgment is affirmed.

MR. JUSTICE BOUCK, MR. JUSTICE KNOUS and MR. JUSTICE HOLLAND dissent.

MR. JUSTICE BOUCK, dissenting.

The Highlander Boy Foundation, defendant in error, brought this action against the City and County of Denver and John F. McGuire its manager of revenue and ex officio treasurer, plaintiffs in error, to quiet the title of certain realty in Denver by declaring paid certain taxes which as a matter of fact were not paid. The Foundation relies upon sections 7392 and 7393, C. L. '21 ('35 C. S. A., vol. 4, c. 142, §§217, 218). The City interposed a demurrer to the Foundation's complaint, the grounds being insufficiency of facts and also defect of parties (because the holders of improvement bonds were not made parties) and, specifically, that judgment in favor of the Foundation would constitute a violation of the following constitutional provisions: Section 10 of article I in, and the due process clause in the Fourteenth Amendment to, the Constitution of the United States; section 38 of article V, and section 6 of article XX, and section 25 of article II, in the Constitution of Colorado. In the case of *Burton v. Denver*, 99 Colo. 207, 61 P. (2d) 856, claimed by the Foundation to be decisive of the present case, section 38 of article V was the only one of the foregoing provisions in our state Constitution involved, and *none of the provisions in the federal Constitution was there invoked*.

The lower court overruled the demurrer and the City elected to stand thereon. The case was thereupon dismissed and is before us for review. Our affirmance of the judgment entered by the district court would necessarily

depend upon our approving the proposition advanced by the Foundation, namely, that, because a certificate of one of McGuire's predecessors as to taxes due on the aforesaid realty erroneously omitted certain special assessments levied against the property the assessments so omitted must be canceled and the lien thereof must be adjudged null and void. If, on the other hand, we cannot approve the above proposition, the judgment must be reversed.

The statutes above referred to and here involved are the following:

"7392. * * * The county treasurer shall certify in writing the entire amount of taxes and assessments due upon any parcel of real estate, and all sales of the same for unpaid taxes or assessments shown by the books in his office, with the amount required for redemption of the same, if still redeemable, whenever he shall be requested to certify as to the taxes on such parcel, and paid or tendered his fees for such certificate, at the rate of fifty (50) cents for the first parcel in each township, incorporated city or town, and ten (10) cents for each subsequent parcel in the same township, town or city. Each description in the tax list and warrant shall be reckoned a parcel in computing the amount of such fees. [L. '05, p. 309, §2; amending L. '02, p. 118, §147; R. S. '08, §5696.]

"7393. * * * Such certificate with the treasurer's receipt or receipts showing the payment of all the taxes therein specified, and his certificate of redemption from the tax sales therein mentioned, shall be conclusive evidence for all purposes and against all persons, that the parcel of real estate in said certificate, and receipt or receipts described, was at the time thereof free and clear of all taxes and assessments and sales for taxes or assessments, except sales whereon the time of redemption had already expired, and the tax purchaser had received his deed. [L. '02, p. 119, §148; R. S. '08, §5697.]"

These provisions were interpreted in *Burton v. Denver, supra.* That case was cited below by counsel for the

Foundation as decisive of the present one. The trial court sustained the contention, and in overruling the city's demurrer to the Foundation's complaint said: "Even should I disagree with the decision in the Burton case, it is binding on this court upon the question of the constitutionality of the State statute;" and, referring to the argument that the bondholders are necessary parties, continued: "Inasmuch as the statute [C. L. '21, section 7394] provides for reimbursement to the city for any loss occasioned by error of the treasurer in certifying taxes due, bondholders are not injured by any such mistakes or errors, and therefore are not concerned in such a suit as this, and for the same reason there is no impairment of their contracts." The trial court added: "I still adhere to the former ruling that the certificate mentioned in the statute and the statement in the charter are separate and distinct documents, and that consequently the charter provision does not supersede the statute, even assuming it could on the theory that it deals with matters of purely local concern. If the charter provision has taken the place of the statute, why does the treasurer of Denver still issue certificates and accept fees therefor?"

We consider these propositions in their order.

1. Is the Burton case, supra, decisive of this? Even a casual examination shows the radical differences between the two. In the former the taxes involved were in no sense local or municipal taxes of Denver, but, on the contrary, were the general taxes and the Moffat Tunnel Improvement taxes. Here, on the other hand, the only taxes in question are improvement assessments specially levied to pay for local municipal improvements which had of course enhanced the value of the specific property, and which, being local municipal improvements, were necessarily and exclusively of local and municipal concern. Such improvements and the assessments levied on their account constitute one of the most natural subjects for local and municipal legislation, as those words are commonly understood. The charter and ordinances of Den-

ver, in dealing with the improvements here involved, touched nothing outside the corporate limits. This will be elaborated upon later herein. To permit the general assembly to make the laws for Denver in this field would be tantamount to depriving that municipality of its home rule character and powers. The contentions of the defendant in error raise certain constitutional questions that will also be dealt with later on. To avoid misunderstanding of my position I say, without qualification, that we might concede the correctness of the Burton decision to its fullest extent *as applied to the facts shown by the record there,* which are utterly dissimilar to those presented here; yet because of this dissimilarity of facts, the concession would not have the slightest bearing on the principles invoked in favor of upholding home rule in the present case.

2. Was the City assured of *reimbursement? The case at bar demonstrates the weakness of the argument made or implied, for the treasurer who is made a defendant herein was not in office when the error here complained of occurred. The statute then in force cannot lawfully impose upon the incumbent treasurer a liability for the official malfeasance, misfeasance, or nonfeasance of a remote predecessor. Nor can the incumbent treasurer's sureties lawfully be made to answer for the errors either of commission or of omission on the part of the predecessors of their principal. The omission charged in the present case was more than ten years ago, and *nine years* (lacking nine *days*) before this suit to quiet title was begun. It might conceivably have been immeasurably earlier. So we must turn back to those earlier years if we inquire as to the adequacy of the "reimbursement." The sufficiency of official bonds given in such a distant

---

*C. L. '21, section 7394, then in force, was as follows: "For any loss resulting to the county or to any tax purchaser or taxpayer, from an error in said certificate or receipt or receipts, the treasurer and his surety shall be held liable on his official bond. [L. '02, p. 119, §149; R. S. '08, §5698." This section has since been amended, but the constitutional questions have not been simplified thereby. See: '35 C. S. A. [vol. 4], c. 142, §219 (S. L. '31, p. 703, c. 142, §1).

past may well be considered more than doubtful. This situation likewise involves grave constitutional questions, to be referred to hereafter. The important thing to remember is that the constitutional issue here arising is an issue of *unconstitutional interference* apart from any minor issue as to the relative merit of legislative provisions for avoiding or minimizing the loss which would possibly result from the inhibited interference.

3. The purpose of the state statute and that of the charter provision in relation to the treasurer's communicating tax information on application to him are obviously identical, but the significant fact overlooked by the majority opinion herein is that each obviously relates to a different subject matter. In so far as such information refers to local and municipal taxes, like the special improvement assessments here involved for instance, the supplying of it is a purely local and municipal function; to the extent that a Denver officer gives information concerning taxes of the state at large or of the Moffat Tunnel district or any public or municipal entity other than the City and County of Denver, he is performing a function not local or municipal, but is acting as a county and state officer. I shall have occasion later on to resume discussion of the dual role of the City and County's treasurer. At this time I wish simply to emphasize that on the non-local, non-municipal side he is just like any other *county treasurer*.

Reverting now to the constitutional provisions involved in the case at bar, I call attention again to the fact that the Burton case, supra, did not involve section 6 of article XX, or section 25 of article II, in our state Constitution, and did not involve section 10 of article I in the federal Constitution, *or the due process clause in the Fourteenth Amendment therein, or in fact any federal question,* while the present case does. In short, the only constitutional provision relied upon in both cases is section 38 of article V in the state Constitution. As will appear later, it is not necessary to pass on this particular pro-

vision in the present case. If the Fourteenth Amendment were not decisive against the Foundation, however, the Colorado provision just cited—the only one cited in both cases—would probably be so, though in the Burton case, by reason of the fundamental differences already pointed out, it was not necessarily involved.

The foregoing paragraph reveals the immense difference between the facts in the Burton case and those in the one now under review.

To decide the present case properly demands a thorough consideration of at least one of the new constitutional issues thus herein raised for the first time.

I am not sure that the statute could be applied, in so far as their purely local and municipal matters are concerned, even to ordinary municipal corporations organized under the general laws. *The subject of local improvements carries us into the field of the proprietary rights of a municipality and beyond the scope of proper interference by the state.* 1 McQuillin Municipal Corporation (2d ed.) 514, §190. Of course the private property of such a municipal corporation, including its contracts and liens, is under the full protection of constitutional provisions dealing with due process of law and the obligation of contracts. Id. 620, 622, §238. These propositions, however, relating as they do to municipalities established by general laws of the legislature, need not be discussed. *A different principle is involved in the case at bar, that of municipal home rule established by the Constitution itself.*

The present City and County of Denver, the municipality here involved, is not the creature of the General Assembly, as was the city of Denver in the days when its charter and charter amendments came from that legislative body, prior to 1904. It is a home rule city and derives its life and powers directly from the state Constitution. The City's defense herein rests on entirely different ground from that occupied by a municipality created by statutes of the state legislature. See: 1 Mc-

Quillin, op. cit., §358, where it said: [page 889] "As a rule, [the power to enact or amend a municipal charter] is limited to the so-called constitutional or home rule class. * * * [page 890] a charter adopted by virtue of the constitution can be amended only in the way prescribed in the constitution, which is controlling as against any statutory enactment or departure therefrom. * * * [page 896]: Amendments are to be restricted to municipal or local affairs as distinguished from those of general or state concern unless the municipality has been given exclusive jurisdiction of the subject matter or concurrent jurisdiction of it with the state."

The charter of Denver framed by the charter convention which met pursuant to the constitutional amendment known as article XX of the Constitution of Colorado became by the express terms of the article "the organic law" for the City and County of Denver and was thereby decreed to "supersede any existing charters and amendments thereof."

By the Home Rule Amendment of 1912 (amending section 6 of said article XX of the Constitution) the people of the whole state changed the fundamental law itself so as to confer the following extraordinarily large powers upon each Colorado home rule city:

"*All * * * powers necessary, requisite or proper for the government and administration of its local and municipal matters, including power to legislate upon, provide, regulate, conduct and control:*

"(a) The creation and terms of municipal offices, agencies and employments; the definition, regulation and alteration of the powers, duties, qualifications and terms of tenure of all municipal officers, agents and employees; * * *

"(e) *The issuance, refunding and liquidation of all kinds of municipal obligations, including bonds and other obligations of park, water and local improvement districts;* * * *

"(g) *The assessment of property in such city or town*

*for municipal taxation and the levy and collection of taxes thereon for municipal purposes and special assessments for local improvements;* such assessment, levy and collection of taxes and special assessment, to be made by the municipal officials or by the county or state officials *as may be provided by the charter."*

The 1912 "home rule" amendment of section 6 of said article XX of our state Constitution, which expressly declares that it *"shall apply to the city and county of Denver,"* and which makes the article *"in all respects self-executing,"* also expressly declares:

*"It is the intention of this Article to grant and confirm to the people of all municipalities coming within its provisions the full right of self-government in both local and municipal matters, and the enumeration herein of certain powers shall not be construed to deny to such cities and towns, and to the people thereof, any right or power essential or proper to the full exercise of such right.*

*"The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except in so far as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters.*

*"All provisions of the charters of the city and county of Denver and the cities of Pueblo, Colorado Springs and Grand Junction, as heretofore certified * * * are hereby ratified, affirmed and validated as of their date."*

Pursuant to the plain language of said article XX of the Constitution, Denver duly adopted the extensive article numbered III in its charter (1927 Denver Municipal Code, pp. 35-70), entitled Department of Improvements and Parks, sections 20-50 of which deal in great detail with local public improvements, contracts therefor, assessment and payment, liens, bonds, and *reimbursement* of the city. A few excerpts from said article III of the charter will indicate the thoroughness with which Denver has treated the subject, and incidentally will show how completely

Denver has by its charter covered the ground and thus in this instance has excluded the possibility of even the temporary reign which a state statute has had accorded to it where a home rule city does *not* so legislate:

"[20] *The city and county shall have power to contract for and make local improvements, and to assess the cost thereof wholly or in part upon the property especially benefited * * *.*"

"[32] * * * *The assessing ordinance shall assess the cost of the improvement against the real estate to be assessed in the district in the proportion finally determined * * *.*"

"[33] *All assessments made in pursuance of this article shall be a lien* in the several amounts assessed against each lot or tract of land, from the publication of the assessing ordinance, *and shall have priority over all other liens except general taxes. * * * No delays, mistakes, errors, defects, or irregularities in any act or proceeding authorized by this article, shall prejudice or invalidate any final assessment * * *.*"

"[34] The auditor shall· * * * prepare a *local* assessment roll, in book form, showing in suitable columns each piece of real estate assessed, the total amount of the assessment, the amounts of each installment of principal and interest, if in pursuance of this article the same is payable in installments, and the date when such installment will become due, with suitable columns for use in case of payment of the whole amount, or of any installment or penalty, and deliver the same to the treasurer for collection, and the same shall be certified by the clerk under the seal of the city and county, with his warrant for the collection of the same, and the auditor charging the amount of the assessment roll to the treasurer, and the treasurer receipting to the auditor for the same.

"The assessor shall provide in the assessment roll of general taxes a column wherein the treasurer may make memoranda of special assessments. The treasurer shall make suitable memoranda in such column, showing any

unpaid special assessments levied before the receipt of the assessment roll, upon the property referred to in such memoranda. On request for the amount of the taxes against any property the treasurer shall include in his statement special assessments. *No error, failure, neglect or default on the part of the assessor or treasurer in complying with the provisions of this section shall invalidate any tax or assessment or affect the lien thereof."*

"[44] *All local improvements shall be paid for in public improvement bonds of the city and county* \* \* \* *to be payable only out of the moneys collected on account of the assessments made for said improvements,* respectively; and all moneys collected on account of the assessments for any improvement shall be applied to the payment of the bonds issued for the same improvement only \* \* \*."

"[45] (being 1916 amendment) The manager of improvements and parks, with the approval of the manager of revenue, *may sell public improvement district bonds* \* \* \* *and pay contractors in cash instead of in bonds* \* \* \*."

"[48] \* \* \* Whenever a public improvement district has paid and cancelled four-fifths of its bonds outstanding, and for any reason the remaining assessments are not paid in time to take up the final bonds of the district, and there is not sufficient money in said special surplus and deficiency fund [provided for in the first part of the section], then the city shall pay said bonds when due and *reimburse itself by collecting the unpaid assessments due said district."*

*It is therefore plain that a public improvement in Denver is always the product of a comprehensive system, established in Denver's charter by direct constitutional authority and requiring issuance of improvement bonds payable either immediately or eventually from moneys derived by levying special assessments which are guaranteed by a lien also created in Denver's "organic act,"* *not by the state legislature.* These are indispensable con-

ditions over which the general assembly can assert no power of veto or amendment. The governmental, proprietary and pecuniary integrity of Denver as a constitutionally segregated city depends upon the ability to enforce the lien, which secures a demand against the real property, not against a person. An improvement district in Denver is created and maintained—and its improvements and payment therefor are governed—by the municipality in virtue of its being such a "constitutional" or home rule city, which by its supremacy as regards its proprietary interests is clothed with constitutional protection. At no point does *the Denver system of public improvements* have the slightest contact with the state's fiscal and revenue system, except in the merely incidental physical identity of the *city's* treasurer, as such, with that treasurer as ex officio *county* treasurer. The respective functions of the officer in these two easily distinguished capacities are clearly separate and apart from each other. It is solely as ex officio *county* treasurer that he acted relative to *general and Moffat Tunnel taxes* in *Burton v. Denver, supra;* it is as a *purely local and municipal officer* in a constitutionally favored home rule city that he acts in connection with a *local improvement* such as appears in the present case. In reference to the latter any attempted interference by the state legislature is barred by the overruling constitutional veto of article XX of the Colorado Constitution.

The dual system—one phase thereof being subject to the principle laid down in the Burton case because it is connected with a *county* function, the other having nothing in common with it because it is a *local and municipal* function—is stressed too by what common knowledge reveals as the practical administration of the two kinds of taxes in the office of the treasurer: the special improvement taxes are handled in the south half of the office, the general and Tunnel taxes in the north half, the two geographical locations being distinct from each other and having different sets of records; the former deals with

the property as such, the latter with the owner or reputed owner to whom the property is assessed. There could be no stronger contrasts than exist between the two.

Naturally, as the majority opinion correctly observes, the provision for the certificate mentioned in the state statute and the charter provision for a "statement" do not present a conflict. Indeed, such an observation necessarily follows as a corollary from the proposition above established, that the two classes of taxation are radically different. *They do not and cannot overlap.*

It must be borne in mind that an improvement tax is in itself utterly unlike a general tax in this: a general tax has no visible symbol; but the improvement tax corresponds to a concrete improvement, seen by the naked eye, a thing which represents an increment, an enhanced value, of the property, speaking as it were to any prospective purchaser or encumbrancer. One cannot well imagine how any man or woman in Denver, seeing the local improvement, could fail to take the precaution of inquiring specifically in regard to a possible improvement tax. This may have had something to do with bringing into Denver's charter the express provision that an error or omission of the treasurer in furnishing a statement of taxes due shall not affect the validity of the tax lien or of the tax.

In view of the sharp distinction between the situation in the Burton case and the one presented by the record before us, it cannot be too often repeated that the present situation involves a home rule city's proprietary rights, whereas the other did not. As already stated, *the due process clause of the Fourteenth Amendment to the United States Constitution was not and could not possibly be invoked in the Burton case,* and counsel there properly omitted to charge a violation of that clause. This is the vital difference between the two situations.

If, however, as I have demonstrated, the lien underlying the improvement tax, and created as it was by Denver's charter under constitutional authority, could

not legally be taken away by any statute of the state legislature, then the enforcement of the tax certificate statute in the present instance would undoubtedly constitute a violation of the due process clause. By enforcing it the trial court committed what I submit is reversible error. The enforcement would not only be violative of that provision in respect to the city itself, but also in respect to the bondholders who, as I have shown, are under the charter inevitably involved in every local improvement undertaken in Denver. Other serious questions arise under both the state and the federal Constitution, but the one just discussed is decisive of this case and I shall not discuss the remaining ones at this time.

For a moment I pause to call attention to the extreme inconsistency which results from the position of the court herein, by referring to the recent case of *Denver v. Henry,* 95 Colo. 582, 38 P. (2d) 895, which decided Denver's right to regulate automobile traffic even regardless of the police power of the state in that general field. Counsel for the City and County of Denver there earnestly urged that a certain municipal ordinance be held ineffectual and inapplicable as against a state statute, in the interests of public safety. This court, however (three of its members dissenting, it is true), decided that, the police power of the state to the contrary notwithstanding, the matter was local and municipal, and that the home rule principle required the sustaining of a municipal ordinance in astonishing and irreconcilable conflict with a state statute constituting a police regulation obviously intended to be of general application. How the Henry decision and the present one can stand together I am unable to understand.

The statute before us now should have been adjudged to be inapplicable to Denver, as a home rule city, and the judgment of the district court should have been reversed with instructions to enter findings and judgment in favor of the City and County of Denver, plaintiff in error herein. If the decision now promulgated by this court stands, the home rule principle—both in theory and in

practice—is forever dead within the City and County of Denver and within every other Colorado home rule city operating under the direct constitutional authority of article XX. Moreover, if that decision stands, this court —whose high duty it is to guard, defend and enforce the Constitution of the United States and the Constitution of Colorado—will have dealt a fatal blow to some of the most precious personal and property rights heretofore enjoyed under what has hitherto been regarded as the supreme law of the land.

For the reasons appearing from the foregoing discussion, I respectfully dissent.

MR. JUSTICE KNOUS and MR. JUSTICE HOLLAND concur in this opinion.